[No. E045796. Fourth Dist., Div. Two. Feb. 5, 2010.]

ROSE VILLANO, Plaintiff and Appellant, v.
WATERMAN CONVALESCENT HOSPITAL, INC., et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V, VII, VIII, and IX and footnote 1.

**COUNSEL**

Berglund & Johnson, Gary L. Gebler, Jerrie S. Weiss and Glenna M. Francis for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Bryan R. Reid, Rima M. Badawiya, Jeffry A. Miller, Lisa Willhelm Cooney and Matthew B. Stucky for Defendants and Respondents Waterman Convalescent Hospital, Inc., Elizabeth Plott Tyler, Plott Management Corporation and Elizabeth R. Plott.

Cole Pedroza, Kenneth R. Pedroza, Cassidy E. Cole; Davis, Grass, Goldstein & Housouer and James G. Davis for Defendants and Respondents Sampat Saste and Phuong Anh Thi La.

## OPINION

**RICHLI, J.**—Plaintiff Rose Villano claims that she was admitted to Mt. Rubidoux Convalescent Hospital (Mt. Rubidoux) without her consent. While there, she was restrained in a wheelchair and in a bed; given dangerous medication, including psychotropic drugs, that she did not need; and denied treatment that she did need, again without her consent.

The trial court, faced with roughly 40 motions in limine, made a number of pretrial rulings that Villano now challenges. Among other things, it bifurcated certain issues to be tried by the jury in a second phase of trial; it further bifurcated a cause of action for statutory violations, to be tried by the court in a third phase of trial. It limited the testimony that would be admissible in the first phase of trial regarding any violations of statutes and regulations and regarding any violations of Mt. Rubidoux's internal policies and procedures. It also drafted a proposed special verdict form that did not provide for any findings on Villano's causes of action for battery, false imprisonment, intentional infliction of emotional distress, or fraud and that assertedly failed to provide for crucial findings on her cause of action for elder abuse.

In light of these rulings, Villano, on the advice of her counsel, refused to proceed with the trial. Instead, she stipulated to the entry of judgment against her on all of her causes of action. She now appeals from the stipulated judgment.

█ We will hold that, under this court's earlier decision in *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422 [77 Cal.Rptr.2d 574], the stipulated judgment is appealable. However, also under *Tudor Ranches*, Villano cannot show that the assertedly erroneous rulings were prejudicial, for two reasons. First, the trial court expressly stated that most of its rulings were merely tentative and subject to reconsideration in light of the evidence at trial. Second, without a trial record, Villano cannot show a reasonable probability that the asserted errors affected the outcome: She might have won, despite the asserted errors; and alternatively, even in the absence of the asserted errors, she might have lost.

Accordingly, we will affirm.

### I

### FACTUAL BACKGROUND

Because this case was not fully tried, we take the following facts from the parties' respective opening statements; thus, they must be viewed as what the parties hoped or expected the evidence would show and not as established facts.

### A. *Villano's Counsel's Opening Statement.*

According to Villano's counsel, in April 2003, when Villano was 77, her husband died. In May 2003, she fell and broke both her wrists. She was depressed and not eating well. On July 31, 2003, employees of a Rite-Aid noticed that Villano had been hanging around for a long time; they called the police, who determined that she was confused and disoriented. She was involuntarily hospitalized at the Riverside County Regional Medical Center (RCRMC) under Welfare and Institutions Code section 5150.

On August 11, 2003, she was transferred to Mt. Rubidoux. She did not consent to either her admission or her treatment there. Procedures for obtaining informed consent when a patient is incompetent were not followed. Her family and friends were not told that she was there.

Because Villano was refusing treatment, she was given psychotropic medication without her consent. She did not receive any treatment, and her anemia got worse. Dr. Sampat Saste was her attending physician as well as the hospital's medical director. He examined her only once, on September 6, even though he was required to examine her within 72 hours.

At all times, Villano was either confined to a bed, by bedrails, or tied into a wheelchair. When she asked to go to the bathroom, she was told to urinate into a towel instead. Eventually, her family and friends managed to locate her. On September 26, 2003, her estate planning attorney took her away, even though Mt. Rubidoux staff tried to stop her from leaving.

### B. *Defendants' Counsel's Opening Statements.*

According to defendants' counsel, when Villano was first involuntarily hospitalized at RCRMC, she was diagnosed with dementia and psychosis. She was transferred to Mt. Rubidoux at the direction of the public guardian's office and with the informed consent of her closest relative, a nephew. When asked to consent herself, she was nonresponsive.

She was examined after a little more than 72 hours, albeit by a physician's assistant rather than by Dr. Saste. She was not capable of giving consent to treatment. She was given psychotropic medications because she showed signs of depression and paranoia. She did not refuse to take them and was not forced to take them. Her anemia was also appropriately treated. During her stay, her condition improved dramatically.

Villano was provided with a waist strap and bedrails because she was at risk of falling. However, she got up and walked for exercise every afternoon.

She had access to a telephone. Her claim that she was not allowed to go to the bathroom was demonstrably untrue.

## II

## PROCEDURAL BACKGROUND

Villano filed this action in 2004. The operative complaint asserted 10 causes of action, for (1) elder abuse, (2) false imprisonment, (3) battery, (4) intentional infliction of emotional distress, (5) "[w]illful [m]isconduct," (6) professional negligence, (7) negligence, (8) fraud, (9) unfair business practices, and (10) statutory violations.

By the time the case went to trial, the named defendants were Waterman Convalescent Hospital, Inc. (doing business as Mt. Rubidoux Convalescent Hospital), Plott Management Corporation, Elizabeth R. Plott Tyler, Elizabeth Plott, Dr. Sampat Saste, and Phuong Anh Thi La.[1]

A. *January 23, 2008: In Limine Rulings.*

On January 23, 2008, the case was called for trial. The trial court proceeded to rule on numerous motions in limine. In connection with six particular motions,[2] which it viewed as related, it made the following three rulings.

First, it ruled that an expert could testify on direct examination to what the standard of care required but not to what a statute or regulation required. If an expert's direct testimony on the standard of care was inconsistent with any applicable statute or regulation, however, the expert could then be cross-examined regarding the statute or regulation. If a statute or regulation became relevant in this manner, the trial court would instruct the jury on what it required.

Second, the trial court ruled that the breach of a "procedural" statute or regulation would not be relevant unless it "result[ed] in harm." To illustrate the meaning of "procedural," it described a hypothetical regulation that "no one should be given a shot of drug A unless . . . the following tests are done beforehand, the following forms are filled out, the following questionnaire is done, et cetera, et cetera . . . ." It characterized an expert's opinion that Villano should not have been given drug A because this regulation had not

---

[1] Defendant Rosemarie Sheehan apparently settled with Villano before trial. However, we have not been able to find any formal dismissal as to her.

[2] Only five of these motions are in the record.

been complied with as procedural. On the other hand, an expert's opinion that Villano should not have been given drug A "because it was not medically indicated" would be substantive.

Third, it ruled that the failure to obtain informed consent from Villano personally would be substantive. However, if Villano was incompetent or incapacitated, the failure to obtain informed consent from a surrogate, in compliance with statutorily mandated procedures (see Health & Saf. Code, § 1418.8), would be procedural. Accordingly, pursuant to its previous ruling, a failure to follow those procedures would be irrelevant unless it resulted in harm. It explained: "If she gets the drug, she gets the drug. It doesn't damage her any more that a nephew in Palmdale approved it or [a] nephew in Palmdale didn't approve it. . . . If it was below the standard of care for her to receive the drug, then she's damaged by receiving the drug."

Finally, the trial court also granted a defense motion in limine to exclude evidence of violations of Mt. Rubidoux's internal policies and procedures. It ruled—much as it had already ruled with respect to statutes and regulations— that witnesses could not be asked on direct examination about internal policies and procedures; however, if a Mt. Rubidoux employee testified to a standard of care that conflicted with an internal policy or procedure, he or she could then be cross-examined regarding the policy or procedure.

B. *January 29–February 1, 2008: Testimony and Off-the-record Discussions.*

On January 29, 2008, a jury was sworn, and both sets of counsel gave their opening statements. Starting on January 29 and ending on January 30, Villano testified. Witness Isabel Garcia then started testifying.

Later on January 30, and continuing on January 31 and February 1, the court and counsel had what the court later described as "a wide ranging discussion on a number of issues," including "how to frame the special verdict . . . ." This entire discussion, however, was off the record.

C. *February 1, 2008: Bifurcation and Special Verdict Form.*

On February 1, when the trial court went back on the record, it bifurcated "all issues regarding the relative liability among the various defendants, corporate and individual," and ordered them heard by the jury in a second phase of trial. It added, "Among the issues that will be postponed until phase two is what exactly is Dr. Saste's liability, if any, under the second hat that he has in this case, that of medical director."

Earlier, the trial court had suggested bifurcating the cause of action for statutory violations. Villano therefore filed a trial brief arguing that she was entitled to a jury trial on this cause of action. Nevertheless, the trial court not only bifurcated it but also ordered it tried by the court in a third phase of trial.[3] It added: "[I]f there is testimony that is relevant only to establishing [the cause of action for statutory violations], such testimony . . . is not relevant and would not come before this jury unless it has relevance toward something else."

The trial court made it clear that its bifurcation rulings were final: "This is not . . . an indicated. This is . . . a ruling." The bifurcation rulings were "not to be readdressed, been there, done that. We're not coming back to argue about it anymore."

The trial court also gave the parties a partial proposed special verdict form.[4] The first set of questions related to negligence and informed consent. The jury was to answer these questions separately as to five specified matters (the use of Coumadin, Risperdal, Remeron, waist restraints, and bedrails).

The trial court characterized its special verdict form as a whole as an "indicated." It did describe its decision to require separate findings on certain matters as "an extremely strong indicated . . . ." However, it also described its choice of these particular five matters (rather than others) as "not a strong indicated, this is just a plain garden variety indicated, . . . because I have not heard the evidence . . . ."

It said it would ask the jury to find whether Villano's admission to the hospital constituted false imprisonment but not whether the use of waist restraints and bedrails constituted false imprisonment, because the special verdict form already adequately covered this issue under the heading of negligence and informed consent.

It also noted that it had not provided for any jury findings on the cause of action for intentional infliction of emotional distress: "We have not spent much time on any discussions or verdict forms because, quite frankly again, this is an indicated, counsel, based solely on opening statement and the testimony of Ms. Villano, that's not going to go to the jury unless something changes. [¶] Something may indeed change. That's why we haven't spent much time on it."

---

[3] It also bifurcated the cause of action for unlawful business practices. Villano had previously conceded that this cause of action could be bifurcated and tried by the court.

[4] Villano claims that her counsel had submitted a proposed verdict form. At oral argument, her counsel further represented that it was 75 pages long. We must disregard these claims, however, because they have not been supported with any citation to the record. (See Cal. Rules of Court, rule 8.204(a)(1)(C).)

Finally, it noted that it also had not provided for any findings on the cause of action for battery: "We haven't spent time on battery either. Probably no good reason. I don't have anything about battery. Otherwise, I don't know what it adds. See my comments about false imprisonment."

The court made some comments about relevance: "[O]ther than the things I've just articulated, . . . up till now, there have been no other acts or omissions . . . which have the potential of having caused harm. Given that, and given that we have bifurcated all the civil penalty issues, . . . what I've just related appears to me to be the universe of what's relevant and what's not relevant. And . . . while I stand prepared to expand the universe of allegations which have the potential to cause harm and, therefore, expand the universe of what's relevant or not relevant, until I expand that as this trial progresses I'll be making relevance rulings based solely on those subjects that I've articulated and only those subjects. And I'll only expand those subjects to include something else which carries at least the potential of causing harm."

Finally, the trial court ruled: "[H]aving heard plaintiff's testimony, if there is a factual issue in which the only evidence for its existence . . . is the plaintiff's testimony and there exists in the record contrary testimony, then my current thinking is that I will find as a matter of law . . . that it cannot go to the jury that that fact can be proven by clear and convincing evidence. . . . [T]o the extent preponderance is enough, it can go to the jury. But if it turns out that it is directly contradicted by other witnesses and there is no corroboration, testimony of the plaintiff alone is not going to be sufficient for clear and convincing. And that's not as a matter of law . . . . That's just the way it is, it's because . . . I observed the witness and I have formed certain impressions about M[s.] Villano . . . ."

Villano's counsel protested: "[Y]our Honor's rulings . . . have tied our hands in this case." In a passionate if somewhat rambling argument, she disagreed with the trial court's rulings (1) limiting evidence of statutes and regulations, (2) limiting evidence of internal policies and procedures, (3) bifurcating certain corporate and individual liability issues, and (4) proposing a special verdict form that did not provide for findings on elder abuse, false imprisonment, or intentional infliction of emotional distress. The trial court merely responded, "To the extent that you wish to assert that I have prejudged any issue in this case, I will emphatically deny that." It did not change any of its rulings.

D. *February 5, 2008: Motion for Reconsideration and Stipulation to Judgment.*

On February 5, Villano filed a motion for reconsideration of all of the foregoing rulings. The trial court denied the motion. It stated: ". . . I'm not reconsidering the bifurcation rulings. [¶] As for the others, they were all indicateds to begin with, so yes, I'm going to reconsider all of them. That's the nature of an indicated."

At that point, counsel for Villano claimed that the trial court's rulings were "tantamount to a nonsuit . . . ." Counsel declared that Villano wanted to "consent[] to judgment on all of the issues on all of the causes of action" and "proceed to the Court of Appeals."

The trial court responded: "Counsel, I can't stop you. . . . [But] I can't in good consci[ence] state on the record that I believe my rulings are tantamount to a nonsuit. I don't believe they are." It added: "[I]f you're asking me to go further and turn these indicateds into rulings, I can't. I haven't heard the evidence."

The trial court further cautioned: "[T]he only thing I can think that's going to be worse than this trial for six weeks is this appeal. . . . [T]his is a project appeal with no record. . . . And you . . . want to go to the Court of Appeal on an indicated. And you appear to want to misconstrue the indicated. That's not a productive appeal. . . . I'm certainly not going to condone such an appeal. Maybe I can't stop it."

Counsel for defendants accepted Villano's consent to judgment. The trial court therefore excused the jury. On March 7, 2008, it entered judgment against Villano and in favor of defendants.

## III

## APPEALABILITY

Defendants contend that the judgment is not appealable because it was entered by consent.

Ordinarily, " '[a] judgment rendered with consent of the appellant is not appealable.' [Citation.]" (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 591 [110 Cal.Rptr.2d 809, 28 P.3d 860].) However, there is an exception to this rule, "namely, that '[i]f consent was merely given to facilitate an appeal following adverse determination of a critical issue, the party will not lose his right to be heard on appeal.' [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21

Cal.4th 383, 400 [87 Cal.Rptr.2d 453, 981 P.2d 79]; accord, *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 817 [226 Cal.Rptr. 81, 718 P.2d 68].) The rationale for this exception is twofold. First, " 'it is "wasteful of trial court time" to require the plaintiff to undergo a probably unsuccessful . . . trial merely to obtain an appealable judgment.' [Citation.]" (*Norgart*, at p. 400.) Second, the exception effectuates the intention of the parties. (*Id.* at p. 401.)

Defendants assert that in this case, there had been no "adverse determination of a critical issue." They argue that the trial court's challenged rulings were merely tentative and hence not "determinations" at all. They further argue the rulings did not relate to any "critical issue" because Villano still had several potentially viable causes of action.

In *Tudor Ranches*, however, this court rejected essentially identical contentions. There, the trial court ruled against the plaintiff (Tudor) on various motions in limine, thereby excluding numerous items of evidence. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra,* 65 Cal.App.4th at pp. 1426–1427.) Nevertheless, it "expressly invited Tudor to present its evidence to the jury and to request reconsideration at that time of any *in limine* rulings with which it was dissatisfied." (*Id.* at p. 1433; see also *id.* at p. 1426.) Tudor chose instead to stipulate to a judgment against it. (*Id.* at pp. 1427–1428.)

We held that the judgment was appealable, even though the trial court's rulings were not final: "*In limine* rulings are by their nature tentative. [Citation.] However, no decision of which we are aware has held that a stipulated final judgment was not appealable because it followed an *in limine* ruling. . . . [¶] We recognize that, without some limitation on the . . . exception, a party theoretically could obtain immediate appellate review of any *in limine* ruling, no matter how inconsequential, provided both parties were willing to stipulate to a judgment finally disposing of all claims. It might be argued that an appeal under [the exception] should be allowed only where the ruling at issue truly makes it impossible as a practical matter for the plaintiff to proceed with the case. However, we are unaware of any authority imposing such a requirement, and to do so would require the reviewing court to make an assessment of the feasibility of the plaintiff's case without the benefit of a trial record. Without guidance from precedent, we conclude that, if the . . . exception is to be thus limited, the limitation should come from the Supreme Court." (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra,* 65 Cal.App.4th at pp. 1430–1431.)

■ Our holding that the stipulated judgment was appealable, however, came with several caveats. We further held that the same standards of review

continued to apply. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra*, 65 Cal.App.4th at pp. 1431–1434.) Thus, the appellant has " 'the burden of showing reversible error by an adequate record.' [Citation.] One aspect of that burden requires that the appellant develop the fullest possible evidentiary record *before* seeking review. Thus, an appellant must make an offer of proof in the trial court in order to claim on appeal that evidence was wrongly excluded. [Citation.] Similarly, if an appellant wishes to argue a point on appeal, it must first make a record by raising the point in the trial court. [Citations.]" (*Id.* at p. 1433.)

Finally—and most significantly for this case—we held that the appellant had to show prejudice: that " ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.]" [Citation.]' [Citations.]" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra*, 65 Cal.App.4th at pp. 1431–1432.)

Tudor argued that the stipulated judgment was reversible per se, citing *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659 [56 Cal.Rptr.2d 803].[5] (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra*, 65 Cal.App.4th at p. 1432.) We distinguished *Kelly*, however, on two grounds. First, there, "the trial court completely foreclosed the plaintiffs from pursuing the only factual theory of liability supported by the evidence. [Citation.] [¶] In contrast, none of the challenged rulings in this case foreclosed Tudor's essential theory of liability. The great majority of the rulings simply precluded certain arguments or discrete items of evidence . . . ." (*Tudor Ranches*, at p. 1432.)

Second, ". . . *Kelly*'s application of a standard of reversibility per se was based on its observation that, in many cases, a court cannot intelligently rule on admissibility at the *in limine* stage because the record is not sufficiently developed to determine relevance, probative value, and potential for prejudice. [Citation.] In such cases, it cannot reasonably be determined on appeal what the outcome would have been absent the erroneous ruling, and reversal should be automatic. [¶] In *Kelly*, however, the court, not the plaintiffs, was responsible for the undeveloped evidentiary record, because, after the court excluded the bulk of the plaintiffs' evidence, it granted a nonsuit based on the remaining evidence. [Citation.] Here, the lower court not only did not grant a nonsuit, it expressly invited Tudor to present its evidence to the jury and to request reconsideration at that time of any *in limine* rulings with which it was dissatisfied. Instead, Tudor made a tactical decision to force immediate review by *stipulating* to an adverse judgment." (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra*, 65 Cal.App.4th at p. 1433, fn. omitted.)

---

[5] *Kelly* was an appeal from a judgment following a nonsuit, not an appeal from a stipulated judgment. (*Kelly v. New West Federal Savings, supra*, 49 Cal.App.4th at p. 669.)

We recognize that, prior to *Tudor Ranches*, cases involving appeals from stipulated judgments did not clearly articulate the need to show prejudice. (Indeed, that militated in favor of our decision to publish *Tudor Ranches*.) In some of these cases, the appellate court upheld the stipulated judgment on the merits and thus had no occasion to consider prejudice. (E.g., *Norgart v. Upjohn Co., supra*, 21 Cal.4th at pp. 404, 410; *Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572, 1585–1595 [236 Cal.Rptr. 912]; *Kenworthy v. Hadden* (1978) 87 Cal.App.3d 696, 703 [151 Cal.Rptr. 169].) Admittedly, in others, the appellate court reversed the stipulated judgment without expressly addressing whether prejudice was required or, if so, whether it had been shown. However, these latter cases cannot be read as holding that prejudice must be presumed.

Take, for example, *Building Industry Assn. v. City of Camarillo, supra*, 41 Cal.3d 810. There, city voters enacted an ordinance by initiative. The plaintiff sued the city, seeking to invalidate the initiative on multiple grounds. The trial court granted partial summary judgment in favor of the city. It ruled that, under Evidence Code section 669.5, the plaintiff had the burden of proof; it also rejected the plaintiff's challenges, to the extent that they were premised on certain specified statutes. (*Building Industry Assn.*, at p. 815.) The plaintiff then stipulated to judgment. However, the stipulation expressly recited that the only remaining issue was whether it was fairly debatable that the ordinance bore a reasonable relation to the general welfare and that the plaintiff "could not prevail on the remaining issue if it had the burden of proof . . . ." (*Id.* at pp. 815–816.) Thus, even though the court did not discuss prejudice, it was essentially stipulated that the trial court's rulings had a dispositive effect on the ultimate outcome.

*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15 [61 Cal.Rptr.2d 518] was similar. There, the plaintiffs owned homes built by defendant Centex. (*Id.* at p. 22.) When they had problems with their foundations, Centex hired defendant Hillebrandt, who recommended certain repairs. Pursuant to a settlement agreement, the plaintiffs released their claims, and Centex's insurer paid for the recommended repairs. (*Id.* at pp. 23–24.) Later, the plaintiffs continued to have problems with their foundations; they learned that Centex and Hillebrandt may have concealed the true extent of the problem. Accordingly, they sued Centex, Hillebrandt, and others, asserting causes of action for fraud, misrepresentation, willful misconduct, negligence, breach of contract, and breach of warranty and seeking to rescind the settlement agreement. (*Id.* at pp. 24–25.) The trial court granted a motion in limine to bar all evidence of communications by Centex and Hillebrandt leading up to the settlement agreement, based on the litigation privilege (Civ. Code, § 47, subd. (b)) and the parol evidence rule. The plaintiffs then stipulated to judgment. (*Edwards*, at pp. 25–26.)

The appellate court reversed. (*Edwards v. Centex Real Estate Corp., supra,* 53 Cal.App.4th at pp. 28–42.) Although it did not discuss prejudice as such, it did discuss the standard of review, and in that discussion, it stated: "The oral and written communications excluded by the trial court's grant of these motions constituted the bulk of the evidence upon which appellants base their causes of action for fraud and willful misconduct. . . . In net effect, respondents' motions *in limine* . . . operated as a general demurrer to appellants' complaints or a motion for judgment on the pleadings. [Citations.] Alternatively, because in this case the trial court granted these motions at the outset of trial with reference to evidence already produced in discovery, they may be viewed as the functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit. [Citations.]" (*Id.* at p. 27.)

 In *Edwards,* the defendants' misrepresentations and nondisclosures were the gravamen of the action; it stands to reason that the wholesale exclusion of their communications was prejudicial. Admittedly, there may have been a lurking argument that the plaintiffs still had viable causes of action, e.g., for negligence or for breach of contract. Precisely because the court did not discuss prejudice, however, it is impossible to tell whether this argument had any potential merit. Moreover, it does not appear that any of the parties actually raised this argument. " ' "It is axiomatic that cases are not authority for propositions not considered." ' [Citations.]" (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [92 Cal.Rptr.3d 595, 205 P.3d 1047].)

Our research has revealed one and only one case that could be read as excusing a showing of prejudice in an appeal from a stipulated judgment. In *Esbensen v. Userware Internat., Inc.* (1992) 11 Cal.App.4th 631 [14 Cal.Rptr.2d 93], a wrongful termination case, plaintiff Esbensen had a written one-year employment contract with defendant Userware. However, he claimed he had been orally assured that the contract would be renewed as long as he was doing a good job. Once the trial court granted a motion in limine to exclude parol evidence of any such oral agreement, Esbensen stipulated to judgment. (*Id.* at p. 635.)

The appellate court reversed. (*Esbensen v. Userware Internat., Inc., supra,* 11 Cal.App.4th at pp. 635–640.) Although it did not discuss prejudice, it did observe: "[O]ur conclusion parol evidence should have been admitted is but a small step on Esbensen's path to ultimate success. A jury must yet determine that the oral representations alleged by Esbensen were in fact made. Assuming they were, the jury must further determine the exact nature of the oral agreement between Rhodes and Esbensen. Assuming this is found to be an understanding that the contract would be perpetually renewed unless there was good cause not to do so, the jury must finally decide whether Userware had 'good cause' to terminate Esbensen." (*Id.* at p. 640.)

■ Once again, however, it does not appear that the respondent was specifically arguing that the appellant had not shown prejudice. Moreover, *Esbensen* was decided before *Tudor Ranches*; hence, it did not have the benefit of our holding that a stipulated judgment, even if based on an erroneous ruling, is not reversible per se. Finally, if *Esbensen* could be viewed as actually holding that a stipulated judgment can be reversed without a showing of prejudice, we would decline to follow it, as contrary to *Tudor Ranches* and the California Constitution. (Cal. Const., art. VI, § 13; see also Code Civ. Proc., § 475.) At a minimum, the appellant must show that the trial court completely foreclosed *all* of its evidence, or *essential* expert testimony without which its claims cannot be proved, thus effectively denying it a hearing and an opportunity to show prejudice. (See *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114–1116 [88 Cal.Rptr.3d 778]; see also *Adoption of Baby Girl B.* (1999) 74 Cal.App.4th 43, 55 [87 Cal.Rptr.2d 569] [Fourth Dist., Div. Two].)

To summarize, under *Tudor Ranches*, the consent judgment in this case is appealable. This is true even if the trial court's challenged rulings were tentative and subject to reconsideration. It is also true even if Villano still had the possibility of recovering on her remaining causes of action.

As we now proceed to review particular rulings, however, these factors may well be significant for another reason: They may make it hard for Villano to show prejudice. The fact that a given ruling was merely tentative and/or the fact that Villano still had viable causes of action may mean that the trial court did not foreclose any "essential theory of liability." (*Tudor Ranches, Inc. v. State Comp. Ins. Fund, supra,* 65 Cal.App.4th at pp. 1432–1433.) Moreover, Villano is "responsible for the undeveloped evidentiary record," because her counsel "made a tactical decision to force immediate review by stipulating to an adverse judgment." (*Id.* at p. 1433, fn. & italics omitted.)

IV

THE SPECIAL VERDICT FORM

Villano contends the trial court's proposed special verdict form effectively prevented her from going to the jury on her causes of action for elder abuse, false imprisonment, battery, intentional infliction of emotional distress, "[w]illful [m]isconduct," negligence, professional negligence, and fraud.

In part III, *ante*, we rejected defendants' argument that the stipulated judgment was not appealable because the trial court's rulings were only tentative or because Villano still had potentially viable causes of action. In the context of whether prejudice has been shown, however, these arguments

are well taken. Villano cannot show that the trial court's rulings regarding its proposed special verdict form were prejudicial.

First, the trial court stated that its special verdict form was only an indicated ruling, which it might change once it heard the evidence. However, we have no way of knowing what the evidence would have shown.[6] A fortiori, we have no way of knowing whether the trial court would have changed its mind.

Second, precisely because we have no way of knowing what the evidence would have shown, we cannot intelligently assess Villano's likelihood of prevailing. The evidence in her favor may have been so strong that, even with the trial court's special verdict form, she would have gone on to win the jury trial; and even if she lost the jury trial, she still might have won the bifurcated court trial. On the other hand, the evidence in defendants' favor may have been so strong that, even if the trial court had given Villano exactly the special verdict form she wanted, she would still have lost. Under either scenario, the trial court's ruling would not have been prejudicial.

## V

## OTHER IN LIMINE RULINGS[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI

## THE BIFURCATION ORDERS

Villano contends the trial court's order bifurcating "all issues regarding the relative liability among the various defendants, corporate and individual" was an abuse of discretion. She also contends the order further bifurcating her cause of action for statutory violations and ordering it tried to the court violated her right to trial by jury.

---

[6] Villano repeatedly points to the evidence that she introduced before trial, in opposition to defendants' motions for summary judgment. That evidence was not before the trial court when it made its rulings. Moreover, given the different legal standards applicable to summary judgment, the parties likely would have introduced substantially more and different evidence at trial. In the absence of an actual trial record, including not only Villano's evidence but also defendants' evidence, we cannot rationally evaluate the effect, if any, that the trial court's asserted errors had on the likely outcome.

[*] See footnote, *ante*, page 1189.

Yet again, Villano cannot show prejudice. Admittedly, the trial court stated that its bifurcation orders were final, not merely tentative.[7] Nevertheless, the problem remains that we have no way of knowing (1) what the evidence would have shown, (2) what evidence the trial court would have ruled admissible or inadmissible in the various phases of trial, or (3) what the ultimate jury verdicts and trial court findings would have been. Both triers of fact might have found in favor of Villano.

■ We recognize that "[t]he denial of the right to jury trial is reversible error per se. [Citations.] No showing of actual prejudice is required." (*Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 698 [59 Cal.Rptr.2d 303].) This principle, however, must be viewed in context. It has been stated in cases in which the appellant was forced to go to trial before the court and *lost*. Under those circumstances, the appellant is not required to show a reasonable likelihood of winning if only there had been a jury trial. "Denial of the constitutional right to a jury trial in a civil case is reversible to prevent a miscarriage of justice. [Citations.]" (*Selby Constructors v. McCarthy* (1979) 91 Cal.App.3d 517, 527 [154 Cal.Rptr. 164].) However, it would be absurd to suppose that an appellant who went to trial before the court and *won* everything that he or she was asking for could obtain a reversal. Yet that might well have happened here, if not for the stipulated judgment.

While a ruling assertedly denying the right to jury trial can be reviewed on appeal, it is "the better practice . . . to seek review of such a ruling by writ, saving the time and expense of a court trial if a jury trial improperly was denied . . . . [Citations.]" (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 862 [251 Cal.Rptr. 530].) If Villano had sought review by writ, she would not have been required to show a miscarriage of justice; however, we would have had the option of denying the writ and waiting to see whether she prevailed at trial. She tried to force us to grant her immediate review by stipulating to judgment and filing an appeal. This subjected her, however, to the standard appellate requirement that she demonstrate a miscarriage of justice. Under the circumstances, she cannot.

---

[7] The order bifurcating the "corporate and individual" liability issues was vague .and ambiguous. Did the trial court mean *derivative* liability issues, such as respondeat superior? Did it mean *comparative* liability issues, such as equitable indemnity? Or both? Or something else entirely?

Thus, even though the trial court stated that this order was final, we would have great difficulty reviewing it without a trial record, which presumably would have shown precisely how the parties and the trial court understood the ruling.

VII–IX[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## X

## DISPOSITION

The judgment is affirmed. Defendants are awarded costs on appeal against Villano.

Ramirez, P. J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 23, 2010, S181051.

---

[*]See footnote, *ante*, page 1189.